**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ALISSA ZWICK,

                    Plaintiff,                         CIVIL CASE NO. 06-12639

v.

                                             HON. MARIANNE O. BATTANI

REGENTS OF THE UNIVERSITY OF
MICHIGAN, MARILYN LANTZ, WILHELM A.
PISKOROWSKI, MARK D. SNYDER, AND
FRED BURGETT,

                    Defendants.

_____/

## OPINION GRANTING IN PART AND DENYING IN PART
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.      INTRODUCTION

Before the Court is a Motion for Summary Judgment brought by Defendants Regents of

the University of Michigan, Dr. Marilyn Lantz, Dr. Wilhelm A. Piskorowski, Dr. Mark D.

Snyder, and Dr. Fred Burgett ("Defendants") pursuant to Fed. R. Civ. P. 56(c).  Defendants

claim that summary judgment is appropriate with respect to Plaintiff's claims for (1) violation of

the First Amendment (retaliation); (2) violation of the Fourteenth Amendment's Due Process

Clause; (3) violation of the Fourteenth Amendment's Equal Protection Clause; (4) violation of

Michigan's constitutional right to free speech; (5) violation of Michigan's constitutional right to

due process; (6) violation of Michigan's constitutional right to equal protection; (7) breach of

contract; (8) defamation (as to Defendants Piskorowski, Snyder and Burgett); (9) tortious

interference with a contract (as to Defendants Lantz, Piskorowski, Snyder and Burgett); (10)

intentional inflection of emotional distress; and (11) violation of the Michigan Civil Rights Act.

Because Plaintiff has presented enough evidence to potentially prevail on the due process claim, Defendants' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.

## II.     STATEMENT OF FACTS

Plaintiff Alissa Zwick enrolled in the University of Michigan Dental School in the Fall of 2002.  Her first year at Dental School was largely uneventful, save for a grade of "D" in one course, which was subsequently remediated.  Plaintiff began having trouble in Fall 2003, her first semester of her second year, when she began losing concentration in class and doing poorly on the practical exams in her Clinical Foundations 621 class, run by Drs. Stoffer and Jaarda. Plaintiff went to see Defendant Dr. Lantz, the associate dean of student affairs at this time, and confessed that she was having trouble concentrating.  Defendant Lantz recommended that she see a psychiatrist and be tested for Attention Deficit Disorder.  Plaintiff saw two psychiatrists, the second of which diagnosed her with ADD in October of 2003, and she reported her disability to the school.  Subsequently, Drs. Stoffer and Jaarda allowed her to take her tests by the window, as she requested, or in a room by herself.  Despite these accommodations, Plaintiff failed 621. She was placed on probation and offered an opportunity to remediate the class by passing Clinical Foundations 631 in the following semester, also run by Drs. Stoffer and Jaarda.

Plaintiff contacted Drs. Stoffer and Jaarda before the beginning of the semester in January 2004 and requested that she take exams in a separate room.  Drs. Stoffer and Jaarda resisted this accommodation, as they felt that it would give Plaintiff an unfair advantage and would not accurately represent the practice of dentistry.  They arranged with Plaintiff to have her take the exam with the class and retake it in a separate room if she failed.

However, when informed of this arrangement Defendant Lantz falsely told the Dean of

the Dental School, Dr. Polverini, that Drs. Stoffer and Jaarda were failing to accommodate Plaintiff and that litigation was likely to result. Defendant Lantz drew up a list of accommodations and told Drs. Stoffer and Jaarda to either sign the list or step down. As a result of this maneuvering, Drs. Stoffer and Jaarda resigned from their positions in February 2004. This move caused a great deal of controversy at the dental school, and, according to Plaintiff, a number of the students began to blame her for the resignations. Defendant Lantz counseled Plaintiff not to talk to her fellow students and to take a week off to let the situation die down. She also warned Plaintiff against talking to Drs. Stoffer and Jaarda, and according to Plaintiff, warned Plaintiff's father that Plaintiff might not be invited back if she tried to talk to either students or faculty about the controversy (Defendant Lantz denies this).

Plaintiff eventually talked to Drs. Stoffer and Jaarda and explained that she never considered litigation and that she was happy with their accommodations. Plaintiff then brought this information to Dean Polverini, who reinstated Drs. Stoffer and Jaarda in their positions in May 10, 2004. In the midst of this turmoil, Plaintiff failed 631, which meant that she failed to remediate 621 as well. On May 11, 2004, Defendant Lantz and the Academic Review Board met and the board voted to dismiss Plaintiff based on her failing grades.

Plaintiff was given the opportunity to appeal the dismissal, and – based largely on the events surrounding the resignations of Drs. Stoffer and Jaarda – won her appeal. She was reinstated at the Dental School and allowed to remediate her failing grades in 621 and 631 in the Summer of 2004. Plaintiff successfully remediated these courses and was removed from probation.

In Fall 2004, Plaintiff received mostly passing grades, but failed Pediatric Clinic 743A. In Comprehensive Care Clinic 720, Plaintiff received an overall grade of B, but received two

incomplete grades (a D and a C-) in various parts of the class.  While Plaintiff contends that these grades were only for the student's edification – and indeed they do not count towards Plaintiff's GPA – Plaintiff acknowledges that she was required to repeat the parts that she failed. Plaintiff was placed on the warned list for the "D" grade in 720 and was allowed to remediate the failing grade in 743A the following semester, which Plaintiff did.

Written complaints from this time composed by various faculty members in the two clinics (Drs. Heys, Johnson and Benham in 720, and Drs. Pink, Fontes and Alaki in 743A) indicate faculty concerns with her patient management, preparation and practical ability.

In Winter 2005, Plaintiff failed Pediatric Clinic 743B and received two incomplete grades (two C-) for various parts of Comprehensive Care Clinic 720.  On May 10, 2005, Plaintiff was placed on probation.  On May 12, 2005, the Academic Review Board (Drs. Heys, Richards, Brooks and Defendant Lantz) met and discussed Plaintiff's case.  According to the minutes, the board reviewed various faculty concerns with Plaintiff's performance, discussed possibly allowing her to use the summer as a "testing ground" and finally resolved to have Defendant Lantz send Plaintiff a letter stating the faculty's concerns about her judgment and ability.  No such letter was ever sent to Plaintiff.

Defendant Lantz and Dr. Heys then asked several faculty members to draft letters of evaluation based on their experiences with Plaintiff.  Defendants Snyder, Burgett and Piskorowski submitted letters, which were negative about Plaintiff's skills and professional future.  Aside from having experience with Plaintiff in a clinical setting, it is unclear why these particular faculty members were selected, but the uniformly negative tone of their evaluations suggests that they were not chosen at random.  The letters are similar thematically – each declares that Plaintiff lacks requisite dental skills, has behavioral issues ("emotionally unstable",

etc.) and would be unfit for the independent practice of dentistry. Defendants Snyder and Burgett wrote their letters independently. Defendant Piskorowski initially composed his thoughts in an email to Dr. Heys, who forwarded the message to Defendant Lantz. Defendant Lantz asked Defendant Piskorowski for a more formal letter, and when he complained that he lacked the computer skills to write such a letter she – shockingly, given the events that transpired between Defendant Lantz and Plaintiff – went to his office and typed his letter for him.

Defendant Lantz then called an unscheduled meeting of the Academic Review Board (Drs. Heys, Richards, Brooks, Upton and Defendant Lantz) on June 16, 2005. Presented with the faculty evaluations, the board voted to dismiss Plaintiff. Plaintiff was notified on June 20th. Plaintiff appealed the decision and argued her appeal before the Academic Review Board with counsel present on December 8, 2005. The board denied the appeal and again recommended dismissal. Plaintiff appealed that decision to the Executive Committee of the Dental School and argued her appeal before the committee on January 11, 2006. The committee denied the appeal and Plaintiff was dismissed.

Plaintiff brought this action in Michigan state court, and Defendants removed it to this Court. After extensive discovery, Defendants filed this motion for summary judgment on August 3, 2007.

### III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) authorizes the Court to grant summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." There is no genuine issue of material

fact if there is no factual dispute that could affect the legal outcome on the issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). In other words, the movant must show he would prevail on the issue even if all factual disputes are conceded to the non-movant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Accordingly, in the instant case, this Court evaluates the motions with the rule that it should defer to the Plaintiff's factual account whenever that account clashes with the Defendants'. The Court should keep in mind, however, that the Plaintiff "may not rest upon the mere allegations or denials of [her] pleading, but... must set forth specific facts showing that there is a genuine issue for trial" Anderson, 477 U.S. at 248 (internal quotations and citation omitted).


## IV.     ANALYSIS

### A. Due Process

Plaintiff claims that her dismissal was a violation of due process under both the United States and Michigan constitutions.[1] As a threshold matter, Plaintiff must show that her place at the Dental School was a property or liberty interest recognized by Michigan state law to assert a denial of due process claim under the Fourteenth Amendment. Board of Curators of the Univ. of Missouri v. Horowitz, 435 U.S. 78, 82 (1978) (finding that to receive the procedural protections of the Fourteenth Amendment, the plaintiff must "demonstrate that her dismissal from the school deprived her of either a "liberty" or a "property" interest").

---

[1]     Under Gazette v. City of Pontiac, 536 N.W.2d 854, Michigan's due process protections are "construed no more broadly than the federal guarantees" and thus the claims are analyzed together.

1. Property Interest

Property interests are secured by "existing rules and understandings" and it is Plaintiff's burden to show that her seat at the Dental School was a "property" interest. Perry v. Sindermann, 408 U.S. 593, 599-603 (1972). Though the arrangement between student and school does not rise to the level of a contractual relationship, the Court determines that a student has enough of a property interest in continued enrollment to require the basic protections of due process.[2]

In Regents of Univ. of Mich. v. Ewing, 474 U.S. 214 (1985), the Supreme Court held that the existence of a property right was unnecessary to determine, as the Court simply assumed the existence of a right for the purposes of dismissing the defendant's due process claim. Id. at 223. In the other major case on this issue, Board of Curators , Univ. of Mo. v. Horowitz, 435 U.S. 78 (1978), the Supreme Court similarly assumed both a liberty and a property interest for the purpose of dismissing the defendant's due process claim. Id. at 91-92. The Sixth Circuit has issued contradictory rulings on this point. Compare McGee v. Schoolcraft Community College, 167 Fed.Appx. 429, 437 (6th Cir. 2006) ("The issue of whether a student's interest in continued enrollment at a post-secondary institution is protected by procedural due process has not been resolved") with Flaim v. Medical College of Ohio, 418 F.3d 629, 633 (6th Cir. 2005) ("In this Circuit, we have held that the Due Process Clause is implicated by higher education disciplinary decisions").

This has left a great deal of ambiguity. "The Sixth Circuit, in two cases claiming a violation of procedural due process, simply 'assumed without deciding' that the plaintiffs had

---

[2]   Plaintiff also argues that the continued enrollment is a liberty interest. Though the Court is skeptical of this claim, it is unnecessary to reach a conclusion on this issue in this case, and the Court does not address it.

constitutionally protected property interests in continuing their medical studies." Rogers v. Tennessee Bd. of Regents, 2007 WL 738146 (E.D. Tenn. 2007) (citing to Stevens v. Hunt, 646 F.2d 1168, 1170 (6th Cir. 1981) and Ku v. State of Tennessee, 322 F.3d 431, 435 (6th Cir. 2003)). Lacking any kind of specific guidance, courts generally follow Ewing's lead and assume an interest to reach the due process questions. See, e.g., Bell v. Ohio State University, 351 F.3d 240, 249 (6th Cir. 2003).

Many federal courts, including the Eastern District of Michigan, have found a property interest in continuing education. Picozzi v. Sandalow, 623 F.Supp. 1571, 1576 (E.D. Mich. 1986) (finding that "[a] public university student has a protected interest in continuing his studies"); Dixon v. Alabama State Bd. of Educ., 294 F.2d 150, 157 (5th Cir.1961) ("the right to remain at the college in which the plaintiffs were students in good standing is an interest of extremely great value"); Stoller v. College of Medicine, 562 F.Supp. 403, 412 (M.D. Pa. 1983) (concluding that "a graduate student has a 'property' interest in continuing his studies."); Hall v. Univ. of Minnesota, 530 F.Supp. 104, 107 (D. Minn. 1982) (holding that "[a] student's interest in attending a university is a property right protected by due process"); Woodis v. Westark Community College, 160 F.3d 435, 440 (8th Cir. 1999) (finding that procedural due process applied to nursing student in disciplinary action by community college); Gorman v. Univ. of Rhode Island, 837 F.2d 7, 12 (1st Cir. 1988) (holding that "a student facing expulsion or suspension from a public educational institution is entitled to the protections of due process"); Hart v. Ferris State College, 557 F.Supp. 1379, 1382 (W.D. Mich. 1983) (concluding that "the threat of suspension or expulsion implicates ... property and liberty interests in public education and reputation, and that such interests are within the purview of the due process clause of the Fourteenth Amendment"). Other courts have found no property interest. See Lee v. Univ. of

Michigan-Dearborn, 2007 WL 2827828 (W.D. Mich. 2007) (finding the question unresolved); Osteen v. Henley, 13 F.3d 221, 223 (7th Cir.1993) ("it is an open question in this circuit whether a college student as distinct from an elementary or high school student has a property right in continued attendance"); Tigrett v. Rector and Visitors of Univ. of Virginia, 290 F.3d 620, 627 (4th Cir. 2002) (assuming a property interest without deciding whether one exists).

Michigan state courts have only rarely addressed the issue directly, but they have consistently found a property interest in continued education. The Michigan Supreme Court in Booker v. Grand Rapids Medical College, 120 N.W. 589 (1909) declared that "when one is admitted to a college, there is an implied understanding that he shall not be arbitrarily dismissed therefrom." Id. at 590. In Booker, the Michigan Supreme Court found an implied contractual relationship between student and university to prevent the arbitrary dismissal of black students. Id. The decision – though characterized by the Supreme Court as "antiquated", Ewing, 474 U.S. at 222, fn 7 – nonetheless established that there is a property right in continuing education. More recently, the Michigan Court of Appeals found that "a student who has been accepted to a university has an implied contractual right to continued enrollment in that university." Carlton v. Trustees of University of Detroit Mercy, 2002 WL 533885, *3 (Mich. Ct. App. 2002). The court found that the "implied contractual right" amounted to "the right to continued enrollment free from arbitrary dismissal," which is the Due Process protection laid out in Horowitz and Ewing. Carlton, at *3. Finally, the Michigan Court of Appeals has directly stated that there exists a due process interest in continuing education. See also Imtiaz v. Board of Regents of University of Michigan, 2006 WL 510057, *4 (Mich. App. 2006) ("The right to an education has been recognized a legitimate property or liberty interest protected from arbitrary short term suspensions"). Taken together, these cases demonstrate that Michigan state courts recognize a

property right in continued enrollment in a university.[3]

After careful analysis, the Court finds the arguments in favor of a property interest to be persuasive on this point.  While admission into a college or university is not at all a guaranteed right, the value of continuing one's education after one has been admitted is plain.[4]  As the Fifth Circuit eloquently phrased it in <u>Dixon</u>:

> "The precise nature of the private interest involved in this case is the right to remain at a public institution of higher learning in which the plaintiffs were students in good standing. It requires no argument to demonstrate that education is vital and, indeed, basic to civilized society. Without sufficient education the plaintiffs would not be able to earn an adequate livelihood, to enjoy life to the fullest, or to fulfill as completely as possible the duties and responsibilities of good citizens ... Surely no one can question that the right to remain at the college in which the plaintiffs were students in good standing is an interest of extremely great value."

<u>Dixon</u>, 294 F.2d. at 157.

Therefore, relying on the relevant Michigan state court decisions and persuaded by the logic of fellow federal courts, this Court finds that continued enrollment in a public university amounts to a property interest and a student is thus afforded protection from arbitrary dismissal under the Due Process clause.

---

[3]  Michigan courts, however, do not extend this recognition to construe a contractual relationship between a student and a university.  <u>See</u> Part IV-B, *infra*.

[4]  To use but one example, if a student were prevented from continuing their university education by the action of some third party, a court could not reasonably state that the student was deprived of *nothing* at all.

2. Due Process Violation

With regard to student dismissals, procedural due process requires (1) that a student be informed of their academic situation and (2) that the decision must be careful and deliberate. Horowitz, 435 U.S. at 85. "In the case of an academic dismissal or suspension from a state educational institution, when the student has been *fully informed* of the faculty's dissatisfaction with the student's academic progress and when the decision to dismiss was *careful and deliberate*, the Fourteenth Amendment's procedural due process requirement has been met." Ku, 322 F.3d at 436 (emphasis added).[5]

Here, Plaintiff has presented sufficient evidence to show a material issue over the requirement that the student be "fully informed ... of the faculty's dissatisfaction with her clinical progress and the danger that this posed to timely graduation and continued enrollment," Horowitz, 435 U.S. at 89-90. Plaintiff has offered evidence indicating that though she was informed of the failing grades she received and her placement on probation, Plaintiff was never sent the letter that the board resolved to send in May 2005 indicating their dissatisfaction with her progress and outlining the consequences to Plaintiff. Thus, it would be reasonable to conclude from Plaintiff's evidence that the Academic Review Board's decision to recommend dismissal, emanating from an unscheduled and apparently informal meeting, came without adequate notice to Plaintiff.

Plaintiff's evidence similarly creates a question of fact as to whether the Academic

[5] The analysis of substantive due process is much narrower than procedural due process in the academic setting. To find a violation of substantive due process, Plaintff is required to prove a "substantial departure from accepted academic norms so as to demonstrate that the person or committee responsible did not actually exercise professional judgment." Ewing, 474 U.S. at 225. As Plaintiff has met the evidentiary burden for summary judgment on her procedural due process claim, this analysis is not necessary.

Review Board's decision was the result of "careful deliberation" and "focused professional judgment." Ku, 322 F.3d at 438. Plaintiff has presented facts and testimony that could establish bias (if not animus) on the part of Defendant Lantz. Plaintiff has further provided evidence of Defendant Lantz's prominent role in Plaintiff's dismissal and Defendant Lantz's activities on behalf of the Academic Review Board (e.g., that Defendant Lantz was tasked with sending Plaintiff the letter stating the faculty's concerns, and the letter was never sent to Plaintiff). Additionally, Plaintiff has offered testimony that Defendant Lantz solicited negative letters from faculty members – going so far as to edit Defendant Burgett's and physically type Defendant Piskorowski's – and that Defendant Lantz called the impromptu June 16, 2005 meeting at which Plaintiff was dismissed. Finally, Plaintiff's has submitted other evidence – such as the discrepancy between Plaintiff's grades and Plaintiff's post hoc written evaluations – which supports Plaintiff's theory that dismissal was made in bad faith.

Plaintiff's cumulative evidence surrounding Defendant Lantz is sufficient to create a genuine issue of material fact as to both the information provided to Plaintiff and the careful deliberation of the Academic Review Board with regard to Plaintiff's dismissal. Plaintiff's due process claim therefore survives summary judgment, and Defendants' motion will be denied as to Counts II and V.


*B. Breach of Contract*

Even though the Court accepts that Plaintiff's ongoing education constitutes a property interest, it has never been clearly established under Michigan law that the relationship between a student and a university is explicitly contractual in nature. See Carlton v. The Trustees of the University of Detroit Mercy, No. 225926, 2002 WL 533885 at *3 (Mich. App. 2002)

(unpublished opinion) (only implied contract exists); Tapp v. Western Michigan University, No. 211725, 1999 WL 33326770 at *3 (Mich. App. 1999) (unpublished opinion) ("[c]ourts have rejected a rigid application of contract law in the area of student-university relationships"); Amaya v. Mott Community College, No. 186755, 1997 WL 33353479 at *1 (Mich. App. 1997) (unpublished opinion) (no contractual relationship); Cuddihy v. Wayne State University Board of Governors, 413 N.W.2d 692, 695 (Mich. App. 1987) (a student had no cause of action against the university under a theory of promissory estoppel). See also Lee, 2007 WL 2827828 at *10 (finding no clear law on point and remanding the contract claim to state court to determine its validity).

Contrary to Plaintiff's argument, the Supreme Court in Ewing did not establish a clear contractual relationship with regard to continued enrollment. Ewing, 474 U.S. at 223 (accepting Defendant University's invitation to "assume the existence" of such a property right). The district court in Ewing had rejected the plaintiff's contract claims, finding "no sufficient evidence to conclude that the defendants bound themselves either expressly or by a course of conduct to give Ewing a second chance [to take the NMBE, a qualifying examination]." Ewing v. Regents of Univ. of Mich., 559 F.Supp. 791, 800 (E.D. Mich., 1983) (ruling cited with approval, 474 U.S. at 223-24 fns. 9 and 10). Though the university had provided Ewing with a pamphlet that stated that a qualified student would be given a second chance to take the qualifying exam, the Court held that "[e]ven if he had learned of the pamphlet's contents before he took the examination ... I would not conclude that this amounted either to an unqualified promise to him or gave him a contract right to retake the examination." Id.

Furthermore, it is entirely unclear what such a relationship would require of the Defendants. Plaintiff suggests that the rights associated with such a contract extend to being

"free from arbitrary dismissal" (Pl. Brief at 40), which is functionally the same as the claim for

procedural due process as discussed in Part IV-A, *supra*.  Because (1) there is no established law

creating a contractual relationship between student and university, and (2) Plaintiff does not

articulate a theory for breach of contract separate from the due process claim, Defendant's

motion for summary judgment is granted as to Count VII, and this claim is dismissed.


### C. Equal Protection

Plaintiff claims that she was intentionally treated differently from other similarly situated

without a rational basis – a "class of one" equal protection violation.  <u>Village of Willowbrook v.

Olech</u>, 528 U.S. 562, 564 (2000).  The states cannot make distinctions which either burden a

fundamental right, target a suspect class, or intentionally treat one differently from others

similarly situated without any rational basis for the difference.  <u>Radvansky v. City of Olmsted

Falls</u>, 395 F.3d 291, 312 (6th Cir. 2005) (citing <u>Vacco v. Quill</u>, 521 U.S. 793, 799 (1997)).[6]

The broad discretion afforded universities in their evaluations of students is an important

factor here, as the only way in which the "similarly situated" students are similar to Plaintiff is in

their academic record.  However, "academic evaluations are not limited to consideration of raw

grades or other objective criteria." <u>See</u> <u>Horowitz</u>, 435 U.S. at 89-90.  The Plaintiff fails to

present any evidence that the "similarly situated" students triggered the same concerns from

faculty members, or that the students were considered deficient in clinical work the way that

Plaintiff was judged to be.  Plaintiff's failure to identify a similarly situated student – e.g., a

student who generated concern among the faculty about their practical ability – means that her

---

[6]  "Michigan's equal protection provision [is] coextensive with the Equal Protection Clause of
the federal constitution," and therefore the claims are analyzed together.  <u>Crego v. Coleman</u>,
615 N.W.2d 218 (Mich. 2000).

equal protection argument fails.

Plaintiff would also need to show that the dismissal lacks rational basis. "A 'class of one' plaintiff may demonstrate that a government action lacks a rational basis in one of two ways: either by negating 'every conceivable basis which might support' the government action or by demonstrating that the challenged government action was motivated by animus or ill-will." Warren v. City of Athens, Ohio, 411 F.3d 697, 711 (6th Cir. 2005). Rational basis is a highly deferential standard of judicial review, and despite Plaintiff's best efforts, the evidence she presents cannot negate every conceivable basis which supports the dismissal, because so much of the dismissal involves academic judgment to which the Court defers absent actions outside accepted academic norms. Plaintiff's argument relies primarily on the existence of personal animus on the part of Defendant Lantz. "To demonstrate animus or ill will under Olech, a plaintiff must prove that the challenged government actions were motivated by personal malice unrelated to the defendant's official duties." Klimik v. Kent County Sheriff's Department, 91 Fed. Appx. 396, 401 (6th Cir. 2004). While Plaintiff has presented evidence demonstrating Defendant Lantz' potential bias, Plaintiff has submitted no evidence that any of the members of either the Academic Review Board or the Executive Committee had any ill will, malice, animus or bad faith towards Plaintiff.

Though Plaintiff has submitted sufficient evidence to create an issue of material fact on whether the decision to dismiss was deliberate and considered in the Due Process context, Plaintiff cannot meet the greater burden of showing that the decision lacked a rational basis in the Equal Protection context. For these reasons, Plaintiff's equal protection argument fails, and Defendants' motion for summary judgment is granted as to Counts III and VI, the Equal Protection claims.

*D. First Amendment Retaliation*

To prevail on her federal and state free speech claims[7], Plaintiff must prove that her speech was constitutionally protected, that her injury would chill speech, and that she was dismissed in retaliation for her speech; Plaintiff can prove the first two elements, but fails to prove the third.

"In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views." Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 511 (1969). To establish a retaliation claim, a plaintiff must show "(1) that [she] was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused [her] to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of [her] constitutional rights." Cockrel v. Shelby County School Dist., 270 F.3d 1036, 1048 (6th Cir. 2001).

As a threshold matter, Plaintiff's speech is protected speech. "It would be incredulous to think that the university has carte blanche to retaliate against any student as long as the speech was of a private concern or was made to vindicate the student's private interest." Qvjit v. Lin, 932 F. Supp. 1100, 1109 (N.D. Ill. 1996) (finding that a student's speech was protected where he lodged allegations of misconduct against his advisor). While students' rights are not necessarily co-extensive with the rights of adults in other settings, their expressions will generally be protected as long as they do not "materially and substantially interfere with the requirements of appropriate discipline" or collide with the rights of others. Tinker, 393 U.S. at 513. Defendants

---

[7] The "rights of free speech under the Michigan and federal constitutions are coterminous." In re Contempt of Dudzinki, 667 N.W.2d 68 (Mich. Ct. App. 2003). The federal and state freedom of speech claims are therefore treated as one and the same.

attempt to draw a distinction between public concerns and private matters in the speech context, but as this distinction originates from cases on employee speech, it is inapplicable here. See, e.g., Pinard v. Clatskanie School Dist. 6J, 467 F.3d 755 (9th Cir. 2006) ("Although [the] personal matter/public concern distinction is the appropriate mechanism for determining the parameters of a public employer's need to regulate the workplace, neither we, the Supreme Court nor any other federal court of appeals has held such a distinction applicable in student speech cases, and we decline to do so here"). As Plaintiff's speech was not obscene or necessarily disruptive and was actually quite important – she accused the dean of a publicly funded university of misconduct and supported it with evidence – it is constitutionally protected speech.

The second element of a retaliation claim – chilling speech – is also found here. Plaintiff must show "that the defendant[s'] adverse action caused [her] to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity." Leary v. Daeschner, 228 F.3d 729, 737 (6th Cir. 2000). The dismissal of Plaintiff – if it is seen to be motivated by Plaintiff's speech – would clearly have the effect of chilling speech at the dental school.

Plaintiff, however, fails to prove the final element – that the adverse action was motivated at least in part as a response to the exercise – as "the nonmoving party may not rely on the mere fact that an adverse [action] followed speech that the [moving party] would have liked to prevent." Cockrel, 270 F.3d at 1055. Plaintiff must provide evidence linking the speech in question to the Defendants' decision to dismiss her. However, the long span of time between Plaintiff's speech and Plaintiff's dismissal, while not dispositive, is relevant and it weighs in Defendants' favor. Mulazim v. Corrigan, 7 Fed. Appx. 427 (6th Cir. 2001) (listing a "temporal nexus" as a factor in determining a causal connection in a First Amendment retaliation claim).

While Plaintiff's first dismissal came almost directly after her conversations with Drs. Jaarda and Stoffers and Dean Polverini, the second dismissal – the subject of this suit – occurred well after the Jaarda/Stoffers controversy.  It is thus difficult to tie the dismissal directly to the protected speech based on Plaintiff's circumstantial evidence, and Plaintiff provides no other evidence linking the 2004 speech and the 2005 dismissal.

Additionally, there is no evidence that Plaintiff's protected speech bothered any member of either the Academic Review Board or the Executive Committee aside from Defendant Lantz, or served as a motivation in anyone's decision to dismiss.

The long delay between Plaintiff's speech and the contested dismissal, combined with the fact that the parties most responsible for dismissing Plaintiff did not have a strong motive to retaliate, dooms Plaintiff's attempt to prove the third element of retaliation.  Thus, Plaintiff's First Amendment retaliation claim fails and summary judgment is granted as to Counts I and IV of her complaint.

## E.  Michigan's Elliot-Larsen Civil Rights Act

The Elliot-Larsen Civil Rights Act (the "Civil Rights Act") demands that "[a]n educational institution shall not ... discriminate against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of religion, race, color, national origin, or sex."  MICH. COMP. LAWS § 37.2402.

"Under the Civil Rights Act ... a prima facie case of race discrimination can be made by showing either intentional discrimination or disparate treatment."  Singal v. General Motors Corp., 447 N.W.2d 152, 155 (Mich Ct. App. 1989).  To prove intentional discrimination, the plaintiff must show that he was a member of the affected class, that he was discharged, and that

the person who discharged him was predisposed to discriminate against persons in the affected class and actually acted on that disposition in discharging him." Id. at 155-56. To prove disparate treatment, the plaintiff must show (1) that the plaintiff was a member of the class entitled to protection under the act and (2) that he was treated differently than persons of a different class (3) for the same or similar conduct." Reisman v. Regents of Wayne State Univ., 470 N.W.2d 678, 685 (Mich. Ct. App. 1991) (numbers added). Once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to articulate some nondiscriminatory reasons for the decision. Sisson v. Univ. of Mich. Bd of Regents, 436 N.W.2d 747 (Mich. Ct. App. 1989). If defendants present such reasons, plaintiff must then show that the reasons are actually pretexts for discrimination. Id.

Plaintiff does not present any evidence of intentional discrimination, so her claim under the Civil Rights Act is one of disparate treatment. Plaintiff, who is white, claims that beneficial treatment was given to non-white students and denied her. Her allegations might satisfy the first two elements of disparate treatment, but Plaintiff clearly fails to establish the third element and Plaintiff fails to rebut Defendants' non-discriminatory reasons for dismissal.

Plaintiff presents evidence to suggest that minority students with similar or worse GPAs have not been dismissed. However, this does not necessarily prove that the non-white students had "the same or similar conduct", as "academic evaluations are not limited to consideration of raw grades or other objective criteria." See Horowitz, 435 U.S. at 89-90. The official grounds for Plaintiff's dismissal were the faculty concerns about her ability to practice dentistry and not solely her academic performance.

Furthermore, even if Plaintiff successfully alleged a prima facie case, her argument still fails. Defendants here offer several nondiscriminatory reasons for dismissal: the faculty

concerns, letters of evaluation and Plaintiff's various academic problems.  Thus, the burden shifts to Plaintiff to not only show that the reasons given were pretextual, but also to "present sufficient evidence to establish that race was a determining factor in the decision."  <u>Reisman</u>, 470 N.W.2d at 685.  Plaintiff here has offered only suggestions of a pro-minority bias in grading at the dental school, and in every other part of her case she argues that the determining factor (indeed, the only factor) in her dismissal was personal animus on behalf of Defendant Lantz.  Though Plaintiff argues persuasively that the decision was "pretextual", she fails to show that the decision was a pretext for *discrimination*, and as such summary judgment is granted for the Defendants on Count XI and this claim is dismissed.


### F.  Tortious Interference With Contract

Plaintiff's claim for tortious interference is inadequate for the simple reason that there was no third-party interference.  Under Michigan law "corporate agents are not liable for tortious interference with the corporation's contracts unless they acted solely for their own benefit with no benefit to the corporation."  <u>Reed v Michigan Metro Girl Scout Council</u>, 506 N.W.2d 231, 233 (Mich. Ct. App. 1993).

Plaintiff has presented no evidence as to how Defendants Snyder, Piskorowski or Burgett benefited from her dismissal.  Plaintiff's alternate theory – that Defendant Lantz wanted her dismissed because of a "personality conflict" – is awkwardly imported from the employment context and is somewhat implausible considering that Plaintiff and Defendant Lantz didn't work together, or even interact all that much after the second year (and, in any event, Plaintiff's stay at the school was transitory and Defendant Lantz's was permanent).  For these reasons, summary judgment is granted for Defendants on this claim and Count IX is dismissed.

*G.  Defamation*

Plaintiff's allegations of defamation fail, as Plaintiff presents no evidence proving that the statements are demonstrably false.  The elements of a cause of action for defamation are: (1) a false and defamatory statement; (2) an unprivileged communication to a third party; (3) fault amounting to at least negligence on the part of the publisher; and (4) actionability of the statement.  Hodgins Kennels, Inc. v. Durbin, 429 N.W.2d 189, 192-93 (Mich. Ct. App. 1988).  "The elements of a qualified privilege are (1) good faith, (2) an interest to be upheld, (3) a statement limited in its scope to this purpose, (4) a proper occasion, and (5) publication in a proper manner and to proper parties only."  Prysak v. R.L. Polk Co., 483 N.W.2d 629, 636 (Mich. Ct. App. 1992).  A plaintiff may overcome a qualified privilege only by showing that the statement was made with actual malice.  Id.

While the statements are almost certainly damaging to Plaintiff's reputation ("unfit", "emotionally unstable"), it is impossible to prove them false.  Plaintiff argues that because her classroom evaluations didn't express any of the sentiments in the letters, the letters are false, while Defendants argue that the statements are professional opinions and not provably false; Defendants have the better argument here.  Plaintiff's case for the falsehood of these letters seems to rest entirely on the conflict between the generally neutral daily classroom evaluations – the "bubble sheets" – and the fairly harsh tone taken in the letters.  However, just because someone expressed (or, more accurately, failed to express) an opinion in the past does not prove that a different or contradictory opinion in the future is "false".  Plaintiff can complain that she was blind-sided by these letters, or that they are unnecessarily harsh, but they are expressions of professional judgment and are not provably false.  Thus, the claim for defamation is dismissed and Defendants' motion for summary judgment is granted as to Count VIII.

*H. Intentional Inflection of Emotional Distress*

To succeed in a claim for intentional inflection of emotion distress, a plaintiff must show "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation and (4) severe emotional distress."  Roberts v. Auto-Owners Insurance, 374 N.W.2d 905, 908 (Mich. 1985).  To satisfy the first claim, the conduct must be so outrageous and extreme as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized society.  Id. at 909.  This is a high standard to meet, and the set of facts here are clearly insufficient to meet it.  The most that Plaintiff alleges against any of the Defendants is "bad faith", which under Roberts is not enough to constitute an affront to decency and meet the first element of this tort.  As such, summary judgment is appropriate as to Count X of Plaintiff's complaint and this claim is dismissed.


**V.      CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED** that Defendants Motion for Summary Judgment is **DENIED** as to Count II and V of Plaintiff's complaint and **GRANTED** as to all other Counts.

**IT IS SO ORDERED.**


s/Marianne O. Battani

MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE


DATED: April 28, 2008

**CERTIFICATE OF SERVICE**

Copies of this Order were served upon counsel of record on this date by ordinary mail and/or electronic filing.

<u>s/Bernadette M. Thebolt</u>

DEPUTY CLERK